Welcome to the Fifth Circuit. We have three arguments set for today. We'll call the first case Cedio v. Garland. Mr. Higgins. Thank you very much, Your Honor. May it please the Court. Matthew Higgins for Petitioner Gillen Cedio. Jose Gillen Cedio received multiple targeted direct death threats from a murderous organization that showed itself to be inclined to carry out those threats, and he was beaten twice, the second time so badly that he had to stay home for a month recovering. That harm, taken together, amounts to persecution, not mere harassment. The BIA's contrary conclusion is an outlier. The Board committed three legal errors on the way to coming to its conclusion that Gillen Cedio did not suffer persecution. What ties these errors together is that they are errors of law, not subject to substantial evidence review, that they violate Fifth Circuit precedent, and that the government hardly musters a response. The Board's first legal error was its failure to analyze the harm that Gillen Cedio suffered as a result of the physical assaults, and as he suffered as a result of the beatings, cumulatively. What do you do with the language, even in the aggregate, in the BIA opinion? So, Your Honor, that is a conclusory statement that simply recites the legal standard. That is not the Board actually applying the legal standard, as this Court said is required in Morales Morales and Alvarado de Gonzalez. What matters is that the Board actually applied the correct legal standard, and when you look at the Board's decision, it has all the hallmarks of a decision that failed to do so. The Board first analyzed and characterized the death threats as though the physical assaults did not exist, and then it analyzed the physical assaults as though the death threats did not exist. And then the case law that the Board cited to underscores its segmented analysis. For the death threats, it cited to no case law, but for the physical assaults, it cited just to three cases, none of which involved physical assaults with accompanying death threats. That shows that the Board analyzed the physical assaults on their own terms, and failed to take the next step to analyze whether the physical assaults and the death threats combined to form a more sustained and more extreme harm. Even though Gil and Cedillo pointed the Board to cases like Ozy and Izy, where the petitioner received handwritten threats and suffered physical beatings, the petitioner suffered the type of cumulative harm that Gil and Cedillo suffered here. Finally, the Board ignored the well-accepted principle that death threats become less isolated, become less similar to mere harassment, when accompanied with physical assaults. That's what this court said in Permuhammad, and that's what circuit courts around the country have ruled. This case seems a little different because the threats, so I understand if people are making threats and then those same people actually take action, that is, they act on the threats, it's obviously much more serious. Here, the people making the threats were different than the police who engaged in the two beatings. Do you have case law talking about that, or how do we deal with that? Yes, absolutely, Your Honor. The standard for whether or not persecution rises to level – or excuse me, whether harm rises to the level of persecution is whether it is extreme and sustained. And harm can be sustained even if it comes from a number of different sources. Case law, to Your Honor's question, Venturini, which we cite on page four of our reply brief and throughout our opening brief, there were three types of harm from three separate actors. The petitioner was fired by his employer, he was beaten by the National Guard, and he was threatened by a private political organization. And this court said it would still be improper to analyze that harm individually. To answer Your Honor's question about case law from assaults from a private organization, and looked at detention from the police, and said because the petitioner was detained by the police, there was an enablement about the physical assaults, and the physical assaults became more harmful and more sustained. We have held repeatedly that repeated beatings, even severe ones, don't necessarily constitute persecution. That's correct, Your Honor. That goes more to our alternative argument regarding substantial evidence. Right now, the main legal arguments that the petitioner is asserting are the legal errors the board applied, the incorrect legal tests it applied, before coming to the conclusion that Gil Ancelio was not persecuted. And of course the beatings here were five minutes and eight minutes long. They resulted in a month-long recovery. But when conducting the substantial evidence review, those beatings need to be viewed in light of the death threats that also occurred. And also to answer your question, Judge Costa, regarding the beatings, there was a close connection between the beatings here and the death threats that Gil Ancelio suffered. Page 47 of the record, the IJA specifically accepts as credible Gil Ancelio's testimony that he could not go to the police because they work with the gang. That shows that the gang was enabling the death threats, and that Gil Ancelio experienced those death threats as more harmful and more credible because of the gang's involvement. And of course here as well, the first beating only occurred after Gil Ancelio showed the police the death threat from the gang. Just a quick, quick threshold question. I had trouble finding your motion for reconsideration to the BIA in the record. Did I overlook it? Is it there, or is it not there? No, there was no motion to reconsideration filed in this case. And of course, a motion to reconsideration was not required. Motions to reconsideration before the Board are only required when the Board's decision creates a new issue, and there was no new issue created in this case. For this specific argument, I'm happy to talk about our second and third legal errors as well. But for this first argument, record page 24 specifically raises the argument that the BIA, which it clearly did, analyzed the death threats completely on their own and without reference to the physical assaults, saying they were mere harassment, and then analyzed the physical assaults. Again, completely on their own, without reference to any of the death threats. This is an independent legal error and is reason enough to vacate the Board's decision. If there are no further questions, I'll turn to the Board's second independent legal error. The Board discounted the persecutory nature of the death threats because they lack corroboration, even though the letters were not reasonably available, and the Board failed to make express findings to that effect. That is a legal error that requires vacater, even if this Court accepts the Board's segmented analysis. On this legal error, the government is literally silent. The government's brief does not even acknowledge this argument, and the five pages of our opening brief devoted to it. This error, again, provides an independent reason to vacate the Board's decision. If there are no questions on that, I'll turn to the Board's third legal error. Again, even accepting the Board's siloed analysis, its treatment of the physical assaults represents a third independent legal error. The Board applied the incorrect legal standard by requiring that beatings result in lasting impairment in order for those beatings to constitute persecution. That misreads Fifth Circuit precedent. Persecution requires a totality of the circumstances analysis, not right-line rules. That was the explanation that the Board gave, and that's the explanation on review before this Court. Again, the Court should vacate the Board's decision for that third independent legal error. The BIA said the injuries were mild. You may disagree with that assessment, but that's certainly a factor, the severity of the injury that you have to consider. Where do you see this bright-line rule that you think is a problem? The only legal statements the Board provided was a string cite stating that persecution requires extreme conduct. That string cite was followed by a sentence where the Board states, Respondent has not shown to have incurred any impairment as a result of the beatings he sustained. In doing so, the Board equated extreme beatings necessary to show persecution with beatings that create physical impairment. And to Your Honor's question, the Board did state that the beatings were mild, but it was doing so simply when reciting the background facts of the beatings. It stated the beatings were mild, and it stated other facts that go against a finding of persecution, but it also stated some facts that favor a finding of persecution. Where does it say you have to have a lasting impairment to support a finding of persecution? It says by equating the legal standard, this Board's case law, saying that harm must be extreme, those cases followed a statement saying that Respondent failed to show an impairment as a result of the beatings. That was the legal standard that the Board applied. That was what the Board applied to. And again, when the Board was stating that the beatings were mild, it was simply reciting the background facts. Some of those facts favored persecution, some went against persecution, and some were simply neutral, such as Gil Ancelio was leaving the party shortly before the second beating, and the police officers were in a cop car shortly before the second beating. Those were just the background facts, and when the Board applied those background facts to the law, it required the physical impairment to result from the beatings. That is the incorrect legal standard, and that is the legal standard that is currently before this Court on review. If I may, I'll turn to the remedies for this legal error. So to remedy these legal errors, the Court has two options. At a minimum, it should vacate the Board's decision and remand for the Board to apply the facts of this case under the correct legal standards. The Court, however, is empowered to apply the fixed facts of this case under the correct legal standards and to rule that Gil Ancelio suffered past persecution. That is exactly what the Third Circuit did in Herrera-Reyes, which we quote extensively in the reply brief, and this is what the Fourth Circuit did in Tyro, and what the Eleventh Circuit did in Edison. The harm in this case is extreme and sustained enough that the Court should exercise that power here. Again, harm amounts to persecution if it is extreme and sustained, and the death threats and physical beatings that Gil Ancelio sustained easily meet those requirements. The Board's decision is a departure. Under this Court's precedence, Gil Ancelio's death threats alone constitute persecution. This Court held in Tamara Gomez and then reaffirmed in Makhnojova and Garti Magar that the key consideration in whether death threats rise to the level of persecution is whether the gang issuing those threats shows itself to be inclined to carry them out. And here, Gang 18 arrived to Gil Ancelio's home at exactly the time they said they would arrive to kill him, showing strong evidence that they had the will and the ability to carry out their threats. Let me ask a question. Is the evidence shown here that Gang 18 permeates a whole country? Yes, absolutely. There's testimony from Gil Ancelio that Gang 18 controls both the city and the country at large. That testimony... Because it's a big country, I mean. Yes, yes, absolutely. And then also the government filed its Honduras Country Report, which was before the IJ, which says Gang 18 has pockets of power throughout the entire country. So moving to some other place isn't going to relieve the problem, is the message, your message? Yes, moving to some other place won't relieve the problem, and our request to the Court is to remand to the Board for the government to meet its burden to show that Gil Ancelio cannot safely relocate. Okay. And again, going back to the remedies here, the threats were also specific and targeted. They were imminent, and finally, Gil Ancelio fled right when Gang 18 said he had 24 hours to leave the country or to face death. That sets this case apart from Garty Magar, from Makhnojova, from Jannati, which the 28J letter was filed in, where there was no persecution because the applicants did not immediately flee upon receiving the death threat. And the government, like the Board, does not truly grapple with the facts that make these letters truly persecutory. And although these threats alone constitute persecution, the fact that the beatings also occurred make the BIA's decision even more of an outlier. Again, this Court recognized in Per Muhammad that when death threats are accompanied by physical beatings, they become more persecutory. Again, so taken together, Gil Ancelio's harm amounts to persecution. This Court should issue that ruling, remand to the Board, for the Board to apply the test of whether or not the government has met its burden to show that Gil Ancelio cannot safely relocate in Honduras. And if I may, I'll conclude with our alternative substantial evidence challenge. I do want to emphasize that for the Court to even consider this argument, it must first rule that the Board applied the correct legal test three times over. But if the Board does consider this argument, it should reverse the two reasons outlined in our brief. The Board ignored and mischaracterized Gil Ancelio's key evidence. It mischaracterized Gil Ancelio's second beating as minor, even though he was at home for a month recovering. Again, it also ignored the facts that made the death threats truly persecutory, that they were imminent, that they were express, that Gil Ancelio was targeted, that Gang 18 showed itself to be inclined to carry out the threats, and that Gil Ancelio immediately fled. Second and separately, the record here compels only one reasonable conclusion. In Tamara Gomez, the Court held that persistent death threats from a criminal organization inclined to carry out those threats constitutes persecution and reversed the BIA's contrary ruling, even under the substantial evidence framework. And again, Gang 18 showed a willingness and an ability to carry out their threat by arriving at Gil Ancelio's house at the exact time they said they would kill him. Here, the harm is even worse than Tamara Gomez because he was physically harmed, so much so that he stayed home for a month recovering. There was no physical harm in Tamara Gomez. So the ultimate question, aside from your legal arguments, the ultimate question of whether this rose to the level of persecution is an issue of substantial evidence? So this Court is empowered to remand back to the Board, applying the correct legal standards in the first instance as Third Circuit did in Herrera-Reyes, as the Fourth Circuit and Eleventh Circuit did in the cases we cite, but correct whether or not harm is severe and whether or not harm is sustained as a general matter are questions of fact subject to substantial evidence review. But again, the harm here is sustained and extreme enough that the Court itself can issue the remedy that Gil Ancelio suffered past persecution. Those are remedies for legal errors.  All right, thank you, Mr. Higgins. You have four minutes for rebuttal. And we'll now hear Mr. Pennington for the Attorney General. Thank you, Judge Costa, and good morning. Greg Pennington for the Attorney General. I'm going to start by addressing the three legal arguments, but I'm going to do them in reverse order to kind of piggyback off Judge Willett's question about the motion to reconsider. So the last legal argument he makes is that the Board created this bright-line rule where all successful persecution claims must have lasting impairment. So that was not exhausted with the Board in a motion to reconsider, as this Court held in Avalar-Oliva, where a new legal issue comes directly from the Board's decision, a party must first file a motion to reconsider to exhaust under 8 U.S.C. 1252 D.1. I do understand that exhaustion was not raised in the government's brief, but given that 1252 D.1 is jurisdictional, it can be raised at any time, and the Court should consider exhaustion on this bright-line rule. But exhaustion aside, as you noted, Judge Costa, there's no indication from the Board's decision that it's creating this bright-line rule, as it does in every persecution case, as this Court does in every persecution case. It looks at a variety of factors to determine whether persecution meets this amorphous concept of what is this extreme conduct required under the Act. So in determining what extreme conduct is, it looks at the number of incidents, the prolonged severity of the incidents, whether the applicant was injured, whether they suffered any severe lasting harm. So these are things the Board has always considered, and there's no indication from the Board's decision that it created a rule that, yes, you must show some severe permanent injury from a beating to meet the persecution standard. So under exhaustion or under de novo review, there's just no way to get over this argument the Board created some new legal standard. So that goes to the second legal argument, that the Board required the death threats as corroboration. There's just no evidence that the Board did this, and there's certainly no evidence that the immigration judge did this. And before I get to kind of like a chronological step-by-step of that, I would again say that this was not exhausted with the Board. So if you look at Petitioner's appellate brief to the Board at pages 16 through 28 of the record, not once is corroboration challenged. And there isn't even really any mention of corroboration in that. There's one sentence where they said that the immigration judge found that there was no corroboration, but there was no challenge to any corroboration findings. So I would again say, not exhausted, no jurisdiction. But it is strange. I mean, the BIA opinion first says he's credited. The immigration judge credited him, and we accept that. So then why note the respondent did not provide any corroborative evidence showing the actual letters? I do agree it's a little strange. But if I could walk you through what happened before the agency— Is it saying the weight, we're going to credit him, but the weight's reduced? Then you're not—I mean, you either credit him or you don't, in my view. Right. Well, the only way I really read that part of the Board's opinion is that as it's discussing these death threats, and usually when death threats rise to the level of persecution, there's some sort of immediacy, like someone is going to act on these threats and follow through. So the Board says—Mr. Sedillo says that the gang seized his house on the day he left. And then it says, however, there's no corroboration that this actually happened. So I think that the Board's statement is limited to whether he corroborated that the gang actually came to the house, which might make a difference in the persecution analysis. So was the gang actually going to follow through because these threats were coming over a one-year period? And he never even saw the gang, according to him. So I think that's what the Board was getting at. But if I could step back to what happened before the immigration judge, the immigration judge first tells him several times, please get some evidence, anything to corroborate your claims. And then in the immigration judge's decision, under the credibility section, he says, I will first note that there was no corroboration provided. And then the immigration judge found him generally credible. So the immigration judge did not hold there was no corroboration, therefore you did not meet your burden of proof. There was no specific holding that there was not corroboration. And then when you look at the immigration judge's discussion on past persecution, he doesn't mention corroboration one time. And then after the immigration judge issues the oral decision, Mr. Sedillo says, was it because I didn't get evidence? And the immigration judge replies, no, the real problem with your case is that what you've described to me does not rise to the level of persecution, the extreme conduct required under the Immigration and Nationality Act. So I feel like as we get to the Board, and then I would again say that there was no challenge to corroboration in the appellate brief to the Board, the Board says this one statement that he did not corroborate that the gang actually followed through and took their house. And then the family moved ten minutes away and were not harmed when the gang seized the house and have received no threats or any further action. So I think what the Board was saying is there's just no indication that the gang is targeting bisexuals like Mr. Sedillo in Honduras and certainly not following through. The only piece of country condition evidence submitted was the 2018 State Department report on human rights in Honduras, which the IJ put into the record. And there's really just one paragraph about treatment of the LGBT community in Honduras, which says that there was one incident where national police were accused of raping a man in the capital and that they faced discrimination in Honduras and that human rights groups were working with special victims units of the prosecutor's office to try to bring awareness. So I think what the Board was saying is there was just no corroboration that the gang, and maybe there is like these gangs targeting homosexuals or bisexuals in Honduras, but there's just no evidence in this record. So again, whether through exhaustion or de novo review of this legal question, the court should either dismiss or deny that portion. So that brings me to the last legal argument. I'm a little confused by your last answer, though, because I don't think either the immigration judge or the BIA judge ever said this wasn't because of a protected social group he was in. He just said it didn't rise to this level of severity. I mean, I thought it's been accepted the whole case that this was because of his sexual orientation. That certainly is indicated in the record. The agency didn't make any specific findings about that, but it certainly can be implied. Well, it says they described him as anti-gay letters anyway. Right, no, and I agree that that's pretty much the only conclusion that can be gleaned from this record, but the agency didn't make any actual findings on that. They only denied the application on the past persecution, whether the harm rises to the level of past persecution. And I guess my point was I think what the board was saying is that the threats did not rise to the level of persecution because Mr. Sedillo never actually encountered the gangs. There was no indication that they were going to follow through on these threats. He was actually only harmed by the police, which I'll get to in just a second, and that they threw in this last sentence, which I agree is a little strange, that he didn't provide any corroborative evidence that the gang took the house. So the last legal argument is that the board did not consider this in the aggregate, and I would just point to the court's decision in Edward where this same argument was made, and the court held that there's just no indication that the board or the immigration judge here just looked at one incident and said no persecution, looked at the next incident, no persecution. The immigration judge says individually or cumulatively, I quote, at 303 and 304, and then the board saying in reviewing the IJ's decision says even in the aggregate, these incidents do not rise to the level of persecution. So with all those legal arguments aside, we get to what this case is really about, and that's whether a reasonable immigration judge could find that these incidents do not rise to the level of persecution. So we have these two incidents with the police officers, and I don't want to sound cruel. I mean this is horrible what Mr. Sedillo went through. As in all asylum cases that come before the court, we look at these horrible facts. Nobody should have to endure these things in their home country. But he had two incidents with the police roughly a week apart, January 5, 2018, January 15, 2018, where these officers beat him. His own testimony was that the first incident he had mild injuries, did not see a doctor. The second incident he said he had cuts and scrapes or just scrapes on his arms and legs. He did not need medical care. He says he stayed home for a month, but the record is not clear that he needed the month to recover from severe injuries, as Petitioner seems to kind of say that these injuries were severe. The record just doesn't really support that. A reasonable judge can certainly find that it wasn't severe based on this record. So you have those two incidents, and then he lives in Honduras for a year with no incidents from the police. So looking at that, does a person really constitute putting forth a persecution claim when they have two incidents and then are able to live safely without any interference from the police for the next year? And even Mr. Cedillo during his testimony to the immigration judge when the judge asked him, why did you leave Honduras? And this is at page 283 of the record. He says, I'm afraid of the gangs. So he didn't say that he was afraid of the police. He was afraid of the gangs. So that brings us to what the gangs did. They never confronted him. They gave him these threatening notes. Even his own mother must not have thought that they were that serious because she burned some rather than say, son, you need to get out of Honduras. So he received these over the course of a year, and the gang never followed through. They never did anything to him. His family was never harmed. And even in the end, after he left Honduras, you know, the gang, if you accept this as corroborated and true, took his house, but his family only moved ten minutes away, and they haven't been harmed or threatened since he left Honduras. So I would say based on the totality of the circumstances here, all of the facts, including the duration, the severity, just a reasonable judge could say, nope, this doesn't meet the extreme conduct required under the act to be persecution. And this Court's case law certainly supports that decision. Nothing would compel an opposite conclusion here. So we would ask the Court to dismiss the unexhausted arguments and otherwise deny the petition for review. If there's no further questions, I – Well, as you all know, we get a lot of these cases. This one with three death threats and two beatings does seem a lot more severe than most. What do you think, on just the substantial evidence question, what do you think the most comparable cases are that support the decision below? The case I submitted in the 28J, Jitani, certainly seems comparable, and I think that Judge Ho in that decision went through a pretty exhaustive list of the cases from this circuit and other circuits, where multiple beatings combined with threats do not rise to the level of persecution. At least a reasonable judge could find that it doesn't rise to the level of persecution. And I would briefly, since I do have a little time, would just kind of contrast Tamera, which is the only case in this Court where there was persecution. And that was just an active campaign by Colombian revolutionaries, the FARC, against Mr. Tamera, who was working with the police. And although Mr. Tamera was never harmed, the FARC was pursuing him because of his participation in a raid to get a body out of FARC territory, a police officer's body. And almost everybody on that team was being murdered by the FARC. So there was certainly some immediacy where FARC was carrying out this systematic killing of everybody involved in that team. There was a bike bomb in his neighborhood that he thought was targeted at him. There was just more immediacy to those threats and the harm. And taking that, I would say that this would fall on the line of all the other cases cited in Jitani, including that unpublished case in Sing, which seemed pretty similar. There was two beatings, multiple death threats, to say that a reasonable immigration judge could find that this does not rise to the level of persecution. And the record certainly does not compel a different immigration judge to find otherwise. All right, counsel, I think we have your argument. Thank you. Mr. Higgins, you'll have four minutes to respond. If you can address at some point, you don't have to start with it if it doesn't work with your plan, but if you can address the exhaustion point. Yes, yes, Your Honor. I can start with the exhaustion point. I'll start with legal error two because that was what the government focused on. Oh, excuse me. So here, both the IJ and the BIA did diminish the values of the letters for lack of corroboration, and Gill and Sadio specifically brought that argument directly to the BIA. So the IJ stated, and this is at page 47 of the record, Respondent states that he didn't provide any corroborative evidence because his letters were left in the house that was seized by Gang 18. Then he states, and this is connected, that Respondent describes two instances of physical mistreatment and verbal threats in his testimony. In doing so, the IJ highlighted the physical beatings at the expense of the threatening letters for lack of corroboration, and this is something we would have raised had the government addressed the failure to exhaust argument. Gill and Sadio then challenged that ruling directly to the BIA. He asserted that the IJ erred by considering, quote, only two incidents of physical treatment and verbal threats. That's at page 24 of the record. Further, at page 20 of the record, Gill and Sadio noted that he could not corroborate his death threats because they were in a house that Gang 18 took control of, in other words, that they were not reasonably available. Then at page 22 of the record, Gill and Sadio said, The IJ erred by not considering all the threats, intimidation, abuse, and violence presented in the record. The issue of whether the death threats should carry full weight and merit full consideration was determined by the IJ when the IJ only considered two of those instances fully and then was challenged to the BIA, and the BIA accepted the IJ's reasoning and analysis in full, as Your Honor noted. Second, I'd like to note, in response to the government's argument, that the BIA did discount the persecutory impact of the letters, and we know that from the three facts that the Board looked to when describing whether or not the letters amounted to persecution. The Board looked to just three facts, that Gill and Sadio never had any face-to-face contact with the gang, that there were no more than three letters, and that the letters were not corroborated with physical copies. But the BIA never considered the facts that make the letters truly persecutory, that they were imminent, that they were expressed, that they were targeted, that they were from a gang that showed itself to be inclined to carry out those threats, and that Gill and Sadio immediately fled. There is a direct link between the Board's statement that the letters were not corroborated and its decision to not account for the facts that made the gang's letters truly persecutory. Another point I'd like to respond to is the government stated that the Board stated itself that it applied the aggregate test. That is an argument that other courts of appeals have rejected, simply stating the word aggregate or stating the word cumulative is not enough to apply the cumulative test. That's the Herrera-Reyes decision. That's the Manzer decision, which we cite on page four, or page seven, excuse me, in our reply brief. I think that's what the government's argument really boils down to. So what about exhaustion? You addressed it on the corroboration point. What about on your argument that the BIA, not the IJ, but the BIA imposed a lasting impairment requirement? And I think he said, well, that should have been done in reconsideration. Since it wasn't, there's an exhaustion problem. Not all, Your Honor. So pages 23 and 24 of the record, Gill and Sadio argued to the BIA that the beatings were vicious and severe and extreme enough under this Court's legal tests to amount to persecution, and he did make a legal challenge. He said, again at page 23, the IJ erred as a matter of law and fact by mischaracterizing prolonged police beatings as minor. And it erred as a matter of law, again, by imposing this bright-line rule. And if I may just respond very quickly to the Gentani case. I know I'm out of time. Go ahead. But there are three factors that make this case different from any other case that the government has pointed to. Gill and Sadio fled immediately after receiving the death threats. The death threats were shown to be credible because the gang showed itself to be inclined to carry out those threats, and they were accompanied by physical abuse. There is no case that has similar facts. On your first point, maybe I'm a little confused on the timeline. I thought at least some of the letters were well before he fled. Yes. Tell me what the timing was again. So there were two letters in January of 2018. Around when he was beaten. Exactly. And then two letters in February of 2019. But, again, this harm needs to be taken as a whole. As the government said, there were no other physical beatings after the first two beatings occurred, but that just repeats the board's flawed analysis of analyzing the physical assaults separate from the death threats. All five instances need to be taken together, considered together, and at the end of the fifth instance, when Gill and Sadio said he had 24 hours to leave or face death, he left immediately. And that distinguishes this case from Gentani. It distinguishes this case from Gharti Magar, from Makhnojova, from other cases we cite in our briefs where the court found there was substantial evidence because the petitioner fled immediately. All right. Thank you, Mr. Higgins. Thank you, Your Honor. Hopeful arguments from both sides. Case will be submitted. And we'll call the—